Manfred P. Muecke (SBN 222893)
mmuecke@bffb.com
Bonnett Fairbourn Friedman & Balint, PC
600 West Broadway, #900
San Diego, CA 92101
Telephone: (619) 798-4292
Fax: (602) 274-1199

Andrew S. Friedman (*to be admitted Pro Hac Vice*)
afriedman@bffb.com
Francis J. Balint, Jr. (*to be admitted Pro Hac Vice*)
fbalint@bffb.com
Bonnett Fairbourn Friedman & Balint, PC
2325 East Camelback Road, #300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Fax: (602) 274-1199

[Additional Counsel on Signature Page]
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| HOWARD ROSEN, a California resident, TERRI L. STAUFFER-SCHMIDT, an Arizona resident, MICHAEL A. WEBBER, an Illinois resident, individually and on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SECURITY BENEFIT LIFE INSURANCE COMPANY, a Kansas corporation,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>1. Restitutionary and Injunctive Relief pursuant to Cal. Bus. & Prof. Code §17200, *et seq.*<br>2. Rescissionary, Restitutionary and Injunctive Relief pursuant to 815 ILCS 505/10a(a)<br>3. Equitable or Legal Relief pursuant to Common Law Fraud |

CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this action on behalf of themselves and others similarly situated arising out of a fraudulent scheme concocted by Defendant Security Benefit Life Insurance Company ("Security Benefit"). Plaintiffs allege the following on information and belief, except as to those allegations that pertain to the named Plaintiffs, which are alleged on personal knowledge.

## NATURE OF THE ACTION

1.      In August of 2010, Guggenheim Partners LLC acquired Security Benefit, rescuing the failing insurance company from the brink of insolvency.  Soon thereafter, with the active assistance of an independent marketing organization known as Advisors Excel, Security Benefit devised and implemented a fraudulent scheme to exploit the market for equity-indexed deferred annuities ("EIAs").  EIAs have traditionally featured annual account value credits linked to well-known, third-party stock indices such as the Standard & Poor's 500 or the Russell 1000.  As explained below, EIAs credit account values with a portion of increases in the underlying index at a rate less than 100%, known as the "participation rate" or limit the amount of any account value increase by an annual limit known as the "cap" rate.

2.      Security Benefit's fraudulent scheme included the development and marketing of a series of misleading and deceptive annuity products purporting to provide above-market returns through purported "uncapped" 100% participation in the gains in certain "proprietary" indices artificially engineered specifically for use in these new annuity products (the "Synthetic Indices"). Security Benefit's marketing of "uncapped" and "100% participation" in the returns on these Synthetic Indices was false and misleading without a clear statement that the Synthetic Indices were in fact designed to have much lower returns than the stock indices traditionally used in EIAs.

3.　　In furtherance of this fraudulent scheme, Security Benefit sold its "Secure Income Annuity" and "Total Value Annuity" products (collectively, the "Annuities") to Plaintiffs and thousands of other consumers, offering them the purported ability to earn favorable positive returns by allocating some or all of their account values to the Synthetic Indices that supposedly tracked the performance in certain equity or commodity markets: specifically, the so-called "Morgan Stanley Dynamic Allocation Index Account" (the "MSDA Index") for the Secure Income Annuity, and the so-called "Annuity Linked TV Index" (the "ALTV Index") for the Total Value Annuity.

4.　　Using uniformly misleading marketing materials and illustrations to implement the scheme, Security Benefit deceptively illustrated the performance of the Synthetic Indices as capable of producing double-digit returns to the purchasers of a Secure Income or Total Value Annuity (in particular through the use of a grossly misleading, cherry-picked "backcasting" of the indices' represented performance, as if the Synthetic Indices had existed in the past). Security Benefit enhanced its depicted performance of the Synthetic Indices by contrasting their illustrated performance with less-rewarding returns using "capped" non-proprietary indices, such as the S&P 500 or the Russell 1000. Security Benefit did so with present knowledge that the Secure Income and Total Value Annuities would not in fact perform as represented given their structure and the embedded costs, risks and product features of the Secure Income and Total Value Annuities.

5.　　Security Benefit further misrepresented the nature, attributes and performance of the Synthetic Indices in so-called "Statements of Understanding" delivered to and signed by each prospective purchaser of the Secure Income and Total Value Annuities and by each insurance agent who procured the sale.

6.　　Once consumers purchased the Annuities, they were locked into them by onerous surrender penalties, by bonus claw-back provisions, and by the very

structure of the Synthetic Indices themselves, which were designed to credit no interest until the end of fixed periods ranging from two to five years.

7. As Security Benefit knew, the Synthetic Indices by design would not and could not perform as represented, but instead would generate virtually *zero* returns over the periods in which the consumer is locked into them under the terms of the Annuities.

8. Through this scheme, Security Benefit wrongfully induced Plaintiffs and thousands of similarly situated California and Illinois residents to purchase the Secure Income and Total Value Annuities through materially false and misleading representations and half-truths, in contravention of the California Unfair Competition Law ("UCL") and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). Alternatively, Security Benefit's fraudulent scheme constitutes common law fraud under the law of both states. Plaintiffs in this action therefore seek damages, rescission, restitution and other appropriate forms of equitable or injunctive relief to halt and remedy Security Benefit's scheme to use the Synthetic Indices to induce the sale of Secure Income and Total Value Annuities to California and Illinois residents.

## THE PARTIES

9. Plaintiff Howard Rosen ("Plaintiff Rosen") is domiciled in Ventura County, California, and thus a resident and citizen of the State of California.

10. Plaintiff Terri L. Stauffer-Schmidt ("Plaintiff Stauffer-Schmidt") is domiciled in Maricopa County, Arizona, and thus a resident and citizen of the State of Arizona.

11. Plaintiff Michael A. Webber ("Plaintiff Webber") is domiciled in DuPage County, Illinois, and is thus a resident and citizen of the State of Illinois.

12. Defendant Security Benefit is a life insurance company organized under Kansas law, with its principal place of business located at 1 Security Benefit

Place, Topeka, Kansas, 66636. Security Benefit is thus a citizen of the State of Kansas.

## JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332.  Plaintiffs further allege class claims on behalf of two state-wide classes, each of which includes persons who are minimally diverse from Security Benefit and presents aggregate claims in excess of $5,000,000. This Court accordingly has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

14.   Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff Rosen resides in this District, Security Benefit maintains substantial operations in this District; thousands of Class Members either reside or did business with Security Benefit in this District; Security Benefit engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Security Benefit entered into transactions and received substantial profits from consumers who reside in this District.

## COMMON ALLEGATIONS

### A.   Indexed Annuities

15.   A deferred annuity is a contract between the annuity owner and an insurance company in which the owner makes an up-front payment of premiums to the insurance company that are deposited into an accumulation account (the "Account Value") and left on deposit for a number of years.  During this deferral period, the earnings on the annuity owner's premiums are tax-deferred.

16.   Equity-indexed deferred annuities offer owners the option of allocating the Account Value among several different indexes, theoretically empowering the owner to make his or her own investment risk-reward

CLASS ACTION COMPLAINT

determination. Owners of EIAs select from a limited number of investment options permitting them to allocate their Account Value to: (a) an account crediting a fixed interest rate not less than a modest minimum guaranteed rate; and/or (b) an account crediting interest determined by changes in a designated "index" based on the prices of a collection of equities, bonds, commodities or other assets.

17. Because deferred annuities involve a long-term investment decision (in which the owner's premiums are essentially locked up for years due to hefty surrender charges and other restrictions), the represented performance of the annuity contract (i.e., how much the annuity owner can expect to receive in the future as a lump sum or a stream of periodic payments) is of paramount importance to the consumer. To make an informed decision about deferred annuities and the relative attractiveness of the annuities being sold by different insurance companies, it is critically important to consumers that the issuing insurance companies fully and truthfully disclose all features and risks associated with their annuities, including all material information necessary for prospective purchasers to understand the applicable product costs, charges, anticipated rates of return and penalties.

**B.    The Indexed Annuity Marketplace**

18. Insurance companies go to great lengths to extoll the supposedly exceptional performance of their annuities through a plethora of features and purported benefits calculated to portray superior investment returns and future account value growth.  For example, although in a traditional deferred annuity contract the annuity's account value increased based only on the amount of interest the company credits each year, in the mid-1990's insurance companies began selling deferred ***equity-indexed*** annuities, which tie account value growth to the performance of an established equity index (such as the S&P 500 index or the Russell 1000). This feature purportedly allows the annuity owners to share in the long-term increases in the equity markets while their investment is locked into the

annuity.

19.     The link between index performance and account value was typically constrained, however, by non-guaranteed limits unilaterally imposed by the insurance company. Some products, for example, "capped" the credited index appreciation at a maximum fixed percentage (8% for example) such that the annuity account value would be credited with no more than a set percentage no matter how great the given index increase. Other annuity products limited the consumer's "participation" in a given index's performance, for example, crediting to the account value only a specified percentage (65% for example) of the index's annual return.  Many EIA products imposed ***both*** cap levels and percentage participation rates on the account value's share of the chosen index's upside appreciation.

20.     In short order, therefore, the "cap" levels and "participation rates" associated with equity-indexed deferred annuities became key selling points as insurance companies sought to entice consumers with higher cap levels and participation rates. The higher the cap and participation rate, the more the annuity shares in any appreciation of the index.

21.     As EIA sales soared, insurance companies increasingly used sales illustrations as a weapon to depict anticipated future performance of their respective annuities. These illustrations, used as sales presentation documents, depict projected future annuity values on both a "guaranteed" and a "current" basis. Such illustrations, which were first introduced to promote sales of traditional and universal life insurance products, unfortunately have a long and well-established history as deceptive, misleading and abusive marketing tools allowing companies to misrepresent and overstate the anticipated future performance of insurance products.

22.     By the mid-2000s, as interest rates declined to historically low levels, insurance companies faced declining returns on their invested assets and began to

6

CLASS ACTION COMPLAINT

reduce the current caps and participation rates on their EIAs.

**C.    The Fraudulent Scheme to Develop and Market the Secure Income and Total Value Annuities**

23.    Guggenheim Partners LLC ("Guggenheim") is a private equity financial services firm with more than $190 billion in assets under management. Beginning in 2009, Guggenheim launched a campaign to acquire financially strapped, vulnerable insurance companies. As part of this strategic plan, Guggenheim acquired Security Benefit in July 2010.

24.    In the years leading up to the Guggenheim purchase, Security Benefit had written substantial annuity business that had put stress on its surplus, which had fallen to $420 million at year-end 2009, giving Security Benefit a very weak solvency ratio (the ratio of total assets to total liabilities) of only 104.5%.  In 2009, Security Benefit had acquired a mutual-fund manager with $20 billion in assets under management just as asset prices plunged as a result of the financial crisis. As a consequence, Security Benefit was forced to recapitalize its failing business.

25.    Guggenheim stepped in and acquired Security Benefit in 2010 for $400 million. Guggenheim promptly demutualized Security Benefit, so that its dividends would be paid to Guggenheim rather than its policyholders.

26.    When announcing the acquisition, Guggenheim's managing partner stated that "[t]his transaction enables us to accelerate Security Benefit's growth given the marketplace's increasing demand for robust retirement programs and investment strategies.  We believe that Guggenheim Partners brings resources and product development capabilities that will be advantageous to Security Benefit's current and future clients."[1]

27.    Soon after the acquisition, Guggenheim deployed Security Benefit to

---

[1] https://www.guggenheimpartners.com/firm/news/guggenheim-partners-announces-definitive-agreement (last visited on October 16, 2019).

generate short-term cash by designing, developing and marketing a series of EIAs falsely portrayed as "uncapped" retirement products providing above-market long-term returns through full participation in the performance of certain proprietary indices purportedly protecting annuity owners from market volatility.

28.     To implement this fraudulent scheme, Security Benefit partnered with Advisors Excel, an independent marketing organization, to develop and roll out the Secure Income Annuity in 2011. A year later, Security Benefit again partnered with Advisors Excel to develop and roll out the Total Value Annuity in 2012. As alleged more fully below, the Secure Income Annuity and the Total Value Annuity were both designed, developed and marketed by Security Benefit as part of and in furtherance of the same overarching scheme.

29.     Todd Boehly, the Chairman of Security Benefit, and Cody Foster, co-founder of Advisors Excel, attended Washburn College together. Security Benefit and Advisors Excel partnered to develop the Secure Income and Total Value Annuities and to market both annuity products through an exclusive network of four "elite" marketing organizations: Advisors Excel, Creative Marketing, Gradient Financial and Impact Partnership.[2]

30.     The Secure Income and Total Value  Annuities are both marketed and sold as retirement or investment vehicles and, consistent with that represented objective, the Annuities offer prospective annuity owners the option to purchase the Guaranteed Lifetime Withdrawal Benefit Rider (the "GLWB Income Rider") and other riders providing benefits for nursing home care and terminal illness protection. The GLWB Income Rider, which can only be purchased at the same time as the underlying Secure Income or Total Value Annuity, purports to provide

---

[2] https://www.globenewswire.com/news-release/2012/04/02/1218653/0/en/Security-Benefit-Launches-Innovative-Total-Value-Annuity.html (last visited on October 16, 2019).

CLASS ACTION COMPLAINT

annuity owners with a lifetime annual income during their retirement years, while imposing a rider charge that is applied as a percentage amount deducted each year from the annuity's Account Value.

31. In addition, the Secure Income and Total Value Annuities contain provisions assessing (a) an Initial Annual Spread, which is a percentage amount deducted each year from the annuity's Account Value, (b) an Initial Participation Rate, which is the percentage of the change in the designated index credited to the Account Value at the end of a specified term, and (c) a percentage cap on interest credited to whatever portion of the Account Value is allocated to the S&P 500 index account.

32. The Secure Income and Total Value Annuities also provide for a "Bonus" added to the Account Value, ranging from 8-10% of the initial premium paid by the owner. A specified percentage of the Bonus is recaptured, however, if the Annuity is surrendered or if withdrawals exceeding 10% of the accumulated Account Value are taken during the first 10 years after the Secure Income or Total Value Annuity is issued.

33. Security Benefit rolled out the Secure Income Annuity in March of 2011, describing the annuity as a long-term, low-risk product designed for retirement savings:

> "This annuity is designed for policyholders who intend to hold it for the long-term and who want their interest linked to the stock market without the risk of losing money in the stock market…." Some of the basics of the annuity are that it can be bought by individuals up to the age of 80. It can be purchased through a traditional or Roth IRA, which works well for individuals wanting to rollover money…when they retire or separate from service….

> "One of the exciting features of Secure Income Annuity is the optional Guaranteed Lifetime Withdrawal Benefit (GLWB) that can be selected at purchase….the effect of the [GLWB] roll-up and the annual increase in the lifetime withdrawal percentage working together can have a

significant impact on the amount of lifetime annual income the policyholder can take and can help people be better prepared for their retirement years…"

"Security Benefit Debuts New Fixed Index Annuity With Optional Guaranteed Income for Life."[3]

34.     The Secure Income Annuity was an immediate success, quickly becoming the number one selling EIA in the industry, generating more than $7 billion in premium for Security Benefit. Nonetheless, Security Benefit was not satisfied with this meteoric rise in the EIA marketplace.

35.     In its haste to gain an immediate foothold in the EIA market, Security Benefit had designed the Secure Income Annuity to offer a crediting option tied to the MSDA, a pre-existing proprietary index developed by Morgan Stanley. Recognizing that it could achieve even more aggressive represented performance by developing its own synthetic index, Security Benefit enlisted the assistance of Advisors Excel and EAM Partners LP to devise the ALTVI.

36.     Insurance companies issuing EIAs do not purchase positions in the indices underlying the equity-linked crediting options. Instead, the issuing company establishes an "options budget" each year equal to the amount the company would otherwise credit under the operative fixed interest crediting option.  The company then acquires options to hedge its obligation to credit interest to the equity-linked account based on movements in the selected index and establishes "caps" or "participation" rates based on the terms of the options purchased by the company. Consequently, the costs to acquire hedging options, which are tied to the volatility associated with the assets encompassed by the particular index, determine the level of the established "caps" or "participation" rates.  For this reason, the lower option

---

[3] https://www.winkintel.com/2011/03/security-benefit-debuts-new-fixed-index-annuity-with-optional-guaranteed-income-for-life/ (last visited on October 16, 2019).

CLASS ACTION COMPLAINT

costs associated with an index having lower volatility allows the company to offer higher "caps" and "participation" rates.

37.     As the next step in its fraudulent scheme, Security Benefit and its partners developed the ALTVI as a crediting option for the new Total Value Annuity designed as a successor to the Secure Income Annuity.  As a mechanism to illustrate even more aggressive yet unachievable projected future returns, Security Benefit incorporated several design features in the ALTVI.  First, Security Benefit tethered the ALTVI to the "Trader Vic Index" which tracks a collection of commodities and other futures and added a "volatility overlay" to reduce anticipated volatility.  In addition, Security Benefit designed the so-called "5-Year Annuity Linked TVI Index Account" allocation option to credit interest only at the end of a designated five-year period while prohibiting any re-allocation during the five-year lock up period (and simultaneously imposing severe penalties on withdrawals during the lock up period).

38.     This design allowed Security Benefit to reduce its own hedging costs, permitting the company to acquire cheaper options due to the reduced volatility associated with the gerrymandered assets tracked by the synthetic ALTVI Index. At the same time, as explained below, Security Benefit selected non-representative benchmark periods during which the Trader Vic Index had reported aberrational high gains in order to project future returns Security Benefit knew to be unattainable.

39.     As the next move in its ongoing scheme, Security Benefit launched the Total Value Annuity in 2012, extolling the new product as a successor to the Secure Income annuity designed for accumulation and retirement savings:

> "Our Total Value Annuity targets savers with an eye toward asset accumulation and we believe is a sensible part of our retirement savings and income product strategy," said Doug Wolff, President, Security Benefit Life.  "Our TVA extends Security Benefit's fixed

index annuity product line that includes the [Secure Income Annuity] and has rapidly become one of the top four selling products in the industry, positioning Security Benefit as one of the fastest growing fixed index annuity providers in the nation."

The Total Value Annuity comes as close to fully addressing the retirement challenge as any product on the market…The Total Value Annuity was designed to protect retirement savings and provide interest on those savings.

"Security Benefit Launches Innovative Total Value Annuity"[4]

40.     As planned, Security Benefit uniformly represented to prospective purchasers that, unlike other annuities, the Secure Income Annuity and the Total Value Annuity would both provide contract owners with the opportunity to receive ***uncapped***, ***100% participation*** in the Synthetic Indices. Thus, in contrast to the severely capped S&P 500 index crediting option, Security Benefit presented consumers with the purported opportunity to link some or all of the Account Value in a Secure Income or Total Value Annuity to: (a) "uncapped," 100% participation in the MSDA Index for the Secure Income Annuity; and (b) "uncapped," 100% participation in the ALTV Index for the Total Value Annuity.

41.     Security Benefit represents to prospective purchasers that the MSDA Index and the ALTV Index are based on underlying indices reflecting changes in the prices of a diversified collection of futures contracts (including equities, commodities, global currencies and interest rates).

42.     To induce sales of the Secure Income and Total Value Annuities, Security Benefit prepared and disseminated to prospective purchasers uniform sales illustrations and marketing materials promoting them and the Synthetic Indices. The Security Benefit sales illustrations are computer-generated documents containing

---

[4] https://www.globenewswire.com/news-release/2012/04/02/1218653/0/en/Security-Benefit-Launches-Innovative-Total-Value-Annuity.html  (last visited on October 16, 2019).

columns depicting projected future Account Values for the Secure Income and Total Value Annuities based on assumed allocations of the values among specified interest crediting options, including allocations to the Synthetic Indices. The Security Benefit marketing materials include brochures describing the purported features of the Secure Income and Total Value Annuities. The marketing brochures also contain side-by-side or seriatim comparisons depicting the potential future Account Values of the Secure Income and Total Value Annuities based on assumed allocations to the available interest crediting options. The projected future performance of the equity-linked crediting options is premised on represented historical returns of the applicable index. To ensure uniformity, the sales illustrations and marketing brochures are all prepared by Security Benefit and distributed to prospective purchasers through sales agents or brokers who use these marketing materials to sell the Secure Income and Total Value Annuities.

43. Security Benefit's objective was to make the Secure Income and Total Value Annuities appear more attractive by steering purchasers into the index account options linked to the Synthetic Indices. The Security Benefit sales illustrations and marketing brochures represent that the potential returns for account values allocated to the "uncapped," 100% participation Synthetic Indices are substantially higher than the returns on account values allocated to the "capped" S&P 500 index option.

44. Indeed, to drive annuity owners into its own Synthetic Indices, Security Benefit designed the Secure Income and Total Value Annuities to throttle the illustrated performance of the S&P 500 index options with extremely low cap rates of 2.5-3.5%. This paltry cap rate, which was lower than the caps and participation rates being offered by other EIA issuers, was intentionally chosen by Security Benefit to induce annuity owners to allocate a large percentage of their account values to the Synthetic Indices (which were more lucrative for Security

Benefit and less favorable to the Secure Income and Total Value Annuity owners).

45.    The low caps and participation rates that Security Benefit imposed on its S&P 500 index option, coupled with stiff surrender penalties, multi-year index terms and bonus claw back penalties also served to lock annuity owners into the Synthetic Indices. The Secure Income and Total Value Annuities contain a ten-year surrender charge schedule with penalties as high as 12% and a corresponding ten-year bonus recapture provision that claws back 100% of the purported "premium bonus" for the first six contract years. Furthermore, the ALTV and MSDA Indices did not mature and credit interest until the end of a specified Index Term, usually 2 or 5 years, meaning that the Account Values would not be credited with interest based on changes in the index until the expiration of the specified Index Term. Security Benefit annuity owners thus faced severe financial penalties if they surrendered their Annuities and had no financially viable escape route from the SP Synthetic Indices because the alternative S&P 500 option offered by Security Benefit carried a significantly below-market, unfavorable cap rate.

46.    Because the ALTV Index is used exclusively with the Total Value Annuities, prospective purchasers have no pre-existing or independent knowledge about the index. Therefore, any decision by an annuity owner to allocate his or her Account Values to the ALTV Index necessarily results from reliance on the representations and omissions made by Security Benefit in its sales illustrations, marketing materials, and contract documents.  The same is true for the MSDA Index, an obscure proprietary index unknown to the consumers comprising Security Benefit's target market.

47.    Security Benefit's aggressive tactics and misleading sales scheme yielded immediate financial rewards for Security Benefit and its parent, Guggenheim Partners. As alleged above, after introducing the Secure Income Annuity, Security Benefit rocketed from unranked on January 1, 2011, to number

one in EIA sales as of December 31, 2011.  And the follow-on Total Value Annuity replaced the Secure Income Annuity as the number one selling product in the EIA marketplace.

### D.   Security Benefit Misrepresents the Features and Performance of the Secure Income and Total Value Annuities

#### 1.   Misleading and Incomplete Sales Illustrations and Marketing Brochures

48.   As alleged above, to induce sales prospects to purchase the Secure Income and Total Value Annuities and direct their premium dollars to the Synthetic Indices, Security Benefit prepares and disseminates misleading sales illustrations and marketing materials depicting that the "uncapped," 100% participation feature of the Synthetic Indices will potentially generate outsized above-market returns – with projected annual returns as high as 8% or higher – far exceeding the comparative performance of crediting options based on "capped" indices like the S&P 500.

49.   The Security Benefit illustrations and marketing materials are deceptive and materially misleading for a variety of reasons.  The Synthetic Indices are not established reference indices, like the S&P 500. To the contrary, they are proprietary "indices" employed by Security Benefit as a mechanism to depict inflated, unattainable future returns using the artifice of purported "uncapped" 100% participation.

50.   To create the appearance that the ALTV Index is a legitimate independent index developed by a reputable financial institution, Security Benefit touts the ALTV Index as owned by The Royal Bank of Scotland. However, ALTV Index is, in reality, developed by Security Benefit for exclusive use in connection with the Total Value Annuities.

51.   Moreover, Security Benefit intentionally employed the Synthetic Indices as a fraudulent artifice to overstate and misrepresent the projected future

performance of the Secure Income and Total Value Annuities and to intentionally induce prospective purchasers and owners of the Annuities to allocate their Account Values to the Synthetic Indices.

52.     To achieve the unattainably high future returns depicted in its illustrations and marketing materials, Security Benefit cherry-picked both the composition of the Synthetic Indices and the historical period used as the benchmark to project the future illustrated values of the Secure Income and Total Value Annuities. Security Benefit used such so-called "backtesting" (or "backcasting") to project future returns based on the non-representative historical performance of a hypothetical collection of assets to a past period beginning years **before the Synthetic Indices even came into existence**.

53.     At the same time, though, Security Benefit intentionally selected Synthetic Indices that produce near-zero returns, simultaneously thereby reducing its own hedging costs.  Thus, the Synthetic Indices were heavily concentrated, either by origin or periodic rebalancing, in cash or cash-like commodities or assets with expected returns close to zero. Security Benefit further eroded even the meager expected returns by spreads deducted by the index managers from the actual annual performance and structuring the Synthetic Indices as "excess return" vehicles (meaning that the actual gross returns are reduced by an amount based on the risk-free rate).

54.     At the same time that Security Benefit cherry-picked the benchmark reference periods to correspond with years when the index asset components exhibited non-representative gains, it inconsistently assumed a 100% participation rate over the entire backcast period even though the hedging costs associated with such market conditions would preclude full participation in the out-sized returns.

55.     In short, Security Benefit knowingly and falsely rigged the illustrated future performance of the Secure Income Annuity and Total Value Annuity by

backcasting performance of the artificial, Synthetic Indices and applying unsupported assumptions – deliberately depicting future returns in its sales illustrations and marketing materials that it knew could not in fact be replicated going forward.

56.    For example, to induce Plaintiff Webber to select the ALTV Index crediting option, Security Benefit provided to him a sales illustration prepared on April 22, 2014.  The Security Benefit illustration depicted results for a $535,000 premium payment allocated 75% to the ALTV Index and 25% to the S&P 500 index based on the most recent 10-year history.  As the following excerpt shows, the illustration depicted the ALTV Index yielding a 38.62% return over 5 years (more than 7.7% per year) with the S&P 500 index yielding only between 0-3.25% during the same time:



### TOTAL VALUE ANNUITY
HYPOTHETICAL ILLUSTRATION

**Most Recent 10 years Scenario Illustrated Values***

Age Lifetime Income 66

| Start of Year | Primary / Secondary Attained Age | Withdrawals (1) | S&P 500® Index Acct Annual Point to Point | | ALTVI Index Acct 5 year Point to Point | | Total Account Value (6) |
|---|---|---|---|---|---|---|---|
| | | | Index Int Rate (2) | Account Value (3) | Index Int Rate (4) | Account Value (5) | |
| 1 | 63 / 53 | $0 | | $147,125 | | $441,375 | $588,500 |
| 2 | 64 / 54 | $0 | 3.25% | $146,047 | 0.00% | $441,375 | $587,422 |
| 3 | 65 / 55 | $0 | 3.00% | $144,292 | 0.00% | $441,375 | $585,667 |
| 4 | 66 / 56 | $29,934 | 3.25% | $112,615 | 0.00% | $441,375 | $553,990 |
| 5 | 67 / 57 | $29,934 | 3.25% | $79,405 | 0.00% | $441,375 | $520,780 |
| 6 | 68 / 58 | $29,934 | 0.00% | $42,535 | 38.62% | $611,856 | $654,391 |

57.    In reality, as the following excerpt from Plaintiff Webber's Annual Statement for 2019 shows, over its 5-year term the ALTV Index exhibited a

*negative* index change of -4.56% resulting in an Index Interest Rate credit of ***"0.00%."***

| 5 Year Annuity Linked TVI Index Accounts | | | | | | |
|---|---|---|---|---|---|---|
| Index Term | Initial Index value | 6/17/2019 Index Value | Index Change through 6/17/2019 | Annual Spread | Participation Rate | Index Interest Rate Before Vesting Percentage |
| 06/17/2014 - 06/17/2019 | 297.00 | 283.47 | -4.56% | 0.50% | 100% | 0.00% |

58.   Security Benefit's uniform marketing materials contained similar false projections of the future returns potentially achieved through allocation of annuity values to the "no cap" crediting options linked to the Synthetic Indices.  These uniform marketing materials also contained misleading comparisons falsely depicting that the future returns available through the Synthetic Indices would be substantially more favorable than those achieved using established indices like the S&P 500.

59.   For example, a Security Benefit marketing brochure from 2014 contained the following graph purporting to compare the performance of a Secure Income Annuity allocated entirely to the MSDA Index to one allocated entirely to the S&P 500, for the period from December 1999 through December 2013:



60.    According to this projection, a Secure Income Annuity funded with an initial $100,000 premium payment would produce a gain of $97,000 over the 14-year period (an annual return of about 7%), while the same annuity allocated to the S&P 500 would have produced a gain of only $27,867.

61.    Again, these unreasonably aggressive backcasted returns for the MSDA Index depicted in the Security Benefit marketing materials stand in sharp contrast to the index's actual real-world performance.  The following chart shows the actual comparative performance of the MSDA Index in juxtaposition to the performance of the S&P 500, Dow Jones and NASDAQ indices over the period from 2014 through 2018:



62.    Security Benefit was able to represent the favorable returns for the Synthetic Indices depicted in its misleading illustrations and marketing materials only by using selectively engineered backcasting techniques to misrepresent the expected future performance of the rigged Indices.  Security Benefit knew that the illustrated future returns for the Synthetic Indices based on its intentionally distorted backcasting models was impossible to achieve because standard economic models using recognized statistical methods (such as the monte carlo analysis) demonstrate that the expected returns for the assets underlying the Synthetic Indices are nearly

zero once the spreads and costs of the Secure Income and Total Value Annuities were taken into account.

63.     Security Benefit's pernicious use of the spiked Synthetic Indices has had a particularly deleterious impact on annuity owners who purchased the Annuities with the GLWB Income Rider. Security Benefit represents that the GLWB Income Rider "is designed to help address longevity risk by providing you with a guaranteed stream of income you cannot outlive."[5] Nonetheless, according to Security Benefit's marketing materials, the GLWB Income Rider provides a "Lifetime Annual Income" based on an "Income Benefit Base … equal to your purchase payments, plus the bonus on purchase payments in the first year, plus the Stacking Roll-up, reduced for partial withdrawals…. The Stacking Roll-up is calculated by adding together the weighted interest rates applied to your Account Value with the guaranteed 4% stacked on top" applied each contract anniversary. The actual Lifetime Annual Income amount is determined as a percentage of the Income Benefit Base dependent on the age at which the owner begins taking the Lifetime Annual Income.

64.     There are numerous restrictions undermining the true value of the GLWB Income Rider.  For example, withdrawals taken before the Lifetime Annual Income begins or any "Excess Withdrawals" exceeding the Lifetime Annual Income Amount will reduce or potentially eliminate the entire benefit available under the GLWB Income Rider.  These restrictions are obscured by the confusing prolix language of the GLWB Income Rider itself, which contains a plethora of interrelated defined terms.

65.     However, even if annuity owners scrupulously comply with these inadequately disclosed restrictions, those who allocate a portion of their Account

---

[5] https://www.sbelitepartners.com/products/total-value-annuity.aspx (last visited on October 16, 2019).

Values to the Synthetic Indices will not receive the illustrated Lifetime Annual Income because the Synthetic Indices are designed and administered to generate near-zero returns that are, in turn, eroded by annual spreads and the Income Rider charges (an initial annual fee equal to .95% of the accumulated Account Value which can increase to 1.80%).

66.    In short, Security Benefit knowingly misrepresented the performance of the Secure Income and Total Value Annuity crediting options by using Synthetic Indices deliberately designed to generate *near-zero* long-term returns to the annuity owner, through materially false and misleading backcasted demonstrations of the purported advantages of allocating all or a portion of the Account Value of the Secure Income or Total Value Annuity to those crediting options.

67.    As Security Benefit knew and anticipated, the actual returns associated with the Synthetic Indices have in fact hovered near zero, lagging far below the returns associated with legitimate, non-proprietary indices like the S&P 500 or the Dow Jones Industrial Average.

68.    Regulators and regulatory bodies, including the National Association of Insurance Commissioners (the "NAIC"), have recognized the potentially misleading nature of back-casted proprietary indices used to illustrate or promote annuities.  For example, the following Bulletin issued by the Iowa Insurance Commissioner to insurance companies issuing annuities in Iowa highlights the very abuses associated with the Annuities:

> The Division has observed that some IMOs are aggressively promoting indexed annuities in potentially deceptive manners.
>
> First, IMOs are emphasizing high-interest lifetime withdrawal benefit riders.  Some of the advertising claim the withdrawal benefit rider has an annual rate of return, *e.g.*, "client earns 8%."  This statement is misleading if the consumer is not equally informed of the restrictions imposed by the rider.

21
CLASS ACTION COMPLAINT

Second, the Division reviewed advertisements on annuity products in which the advertisements offer "uncapped" rates of return. …[I]f the advertising is viewed by a consumer, it has the capacity to contribute to inflated consumer expectations of future performance of the annuity product….[I]n reality, the referenced rate is actually limited by spreads, participation rates, or the design of volatility controls, significantly reducing the actual return.  The use of "uncapped" terminology without additional disclosures of limitations is misleading….

Similarly, some marketing materials depict charts of recently developed "proprietary indices," which did not exist during the illustrated time frame, but are back-casted and hypothetically demonstrate how they would have outperformed traditional indices. … Using these hypothetical performance charts is misleading if they, directly, or indirectly through subsequent representations by producers, are used to project future performance and contribute to inflated consumer expectations.

"Bulletin 14-02" issued September 15, 2014.

69.     Similar concerns about the use of back-casted proprietary indices in sales illustrations and marketing materials were voiced by New York Life, MetLife and Northwestern Mutual in submissions to the NAIC:

[M]any market participants utilize the practice of calculating hypothetical historical returns.  These hypothetical look back calculations take into account the past performance of the underlying index, but not interest rates, volatility or option prices, which are drivers of the non-guaranteed elements.  In certain economic environments, the hypothetical look back approach may allow maximum illustrated rates that are not appropriate for general account life insurance policies and, if used improperly, could be misleading to purchasers….

Statement to NAIC on "Actuarial Guidelines on IUL Illustrations" dated September 5, 2014.

70.     Finance experts have acknowledged the actual and potential abuses stemming from backtested projections, including those made by Security Benefit using the ALTV Index, resulting from the selection of unrepresentative benchmark

time periods, overfitting, data mining, volatility filters and similar assumptions. *See e.g.*, G. Deng, C. McCann and M. Yan, "Structured Products and the Mischief of Self-Indexing," The Journal of Index Investing (Spring 2017); O. Sarfati, "Backtesting: A Practitioner's Guide to Assessing Strategies and Avoiding Pitfalls," CBOE 2015 Risk Management Conference.

### E.     Misleading and Incomplete Statements of Understanding

71.     To ensure uniformity in sales presentations, Security Benefit requires that each purchaser of a Secure Income or Total Value Annuity acknowledge and sign a "Statement of Understanding" ("SOU").  While Security Benefit does so as a defensive maneuver, in this instance the SOU ensures the consistency of Security Benefit's misleading representations regarding the Synthetic Indices.

72.     Each Security Benefit SOU purports to describe the nature, attributes and operation of each interest crediting option available to the annuity owner, including the Synthetic Indices.  These descriptions are critically important because the interest crediting allocation made by the owner will determine the future returns creating growth in the Account Value, which is the most critical purported benefit of the Secure Income or Total Value Annuity.  Where the owner has purchased the GLWB Income Rider, the importance of the future rate of return is magnified because the Stacking Roll Up feature, which determines the amount of Lifetime Annual Income available to the owner, is tied to the level of accumulated Account Value.

73.     Furthermore, the standardized disclosures describing the Synthetic Indices contained in the SOU are of paramount importance because this information, coupled with the illustrations projecting the future performance of the Synthetic Indices and the descriptions in the marketing brochure, are as a practical matter the only information about the Synthetic Indices conveyed or reasonably available to prospective purchasers of the Secure Income or Total Value Annuities.

74.     Given the complexity of the Secure Income and Total Value Annuities, which are opaque at best, incomplete instruments that obfuscate the operative provisions through a maze of complicated and inter-related defined terms, prospective purchasers need accurate, adequate and clearly disclosed information about the Synthetic Indices presented in an understandable format explaining the true costs and values associated with the interest crediting options tied to those indices.

75.     Rather than providing the information necessary for a consumer to make an informed decision whether to purchase a Secure Income or Total Value Annuity or to allocate funds to an account tied to performance of the Synthetic Indices, the SOUs contain misleading information and fail to disclose material information about the Synthetic Indices.

### 1.     **The SOU for the ALTV Index**

76.     The uniform Security Benefit SOU represents that the ALTV Index is based on the Trader Vic Index ("TVI"), which is described as "a published index on Bloomberg."  The SOU further represents that the TVI "was launched by the Royal Bank of Scotland N.V. and EAM Partners LP" and that the Royal Bank of Scotland "serves as the calculation agent for the TVI and the Annuity Linked TVI Index."  This description is a misrepresentation by omission.  It fails to disclose that the ALTV Index in fact was developed by Security Benefit in collaboration with Advisors Excel and the Innovation Design Group, who are contracted to sell the Secure Income and Total Value Annuities and Alpha Artists LP which holds an exclusive license to distribute the ALTV Index.

77.     The Security Benefit SOU describes the ALTV Index as an "index that is based on the Trader Vic Index Excess Return Index (TVI) modified by an index cost fee and a volatility control overlay."  The ALTV Index SOU does not disclose or explain that, as an excess return index, the actual returns of the TVI will be

reduced not only by the 1.25% index cost spread, but also by an additional amount corresponding to the risk-free rate of return.  Furthermore, because the collection of commodities cherry-picked for the ALTV Index already have an expected near-zero return, deduction of the risk free rate has a far greater adverse impact on performance than would be the case for a traditional excess return index, which would have an expected gross annual return closer to 7-9% before reduction by the risk free rate (of about 1%).

78.    The Security Benefit Annuities carry multiple spreads, costs and performance dampening features referenced at disparate locations throughout the prolix SOU and other contract documents that operate collectively to essentially offset the already below-market returns of the ALTV Index.  The collective impact of these spreads and charges – which include the annual spread deducted at the index level, the excess return reduction, the annual spread deducted by Security Benefit and the fact that interest is not credited until the end of the applicable Index Term – is not meaningfully disclosed in the ALTV Index SOU or the other standardized contract documents.

79.    Similarly, the SOU fails to disclose the operation, impact or import of the "volatility control overlay." The volatility control overlay has at least two effects, neither of which is disclosed or explained in the ALTV Index SOU.  First, the volatility control overlay operates to effectively reduce the participation rate when the TVI is volatile. Because there already is a 0% floor on the credited interest rate, the owner actually benefits from volatility, which translates into an effective higher participation rate in higher-yielding assets. When the index is less volatile, the volatility control overlay provides only minimal additional positive performance.

80.    In addition, the volatility control overlay impacts the index cost spread, scaling the fee higher when volatility is lower and scaling the fee lower with

increased volatility. These changes in the index cost fee tend to offset any positive impact of the changes in participation rates resulting from the volatility control overlay.

81.     None of these material facts are disclosed in the SOU. To the contrary, the SOU falsely states that "[t]he volatility control overlay reduces the impact of a fall in price, as well as increases in the price of the TVI." There is minimal or no impact on the Total Value Annuities based on a fall in the level of the TVI because the Total Value Annuities have a 0% floor on the credited interest rate. On the other hand, the volatility control overlay does reduce the positive impact of an increase in the value of the TVI. The ALTV SOU misleadingly suggests that the volatility control overlay has a symmetrical impact on performance of the ALTV Index credits when it does not.

82.     The SOU also represents that "[b]ecause it is based on the TVI, the [ALTV] Index Account provides you with the opportunity to receive index interest credits in times when an  index crediting option based on equity or bond markets would not."  This statement is false and misleading.  The imposition of a 5-year term makes the ALTV Index less advantageous than an annual point-to-point stock or equity index because the 0% floor applied to more traditional annual point-to-point interest crediting options operates to exclude negative annual returns as the index reference point is reset each year, while the 5-year term applicable to the ALTV Index incorporates interim negative returns in determining the applicable interest credit at the end of the Index Term. If a bond index were chosen, there is no scenario under which the ALTV Index would provide an interest credit when the fixed interest index would not. If an equity index were chosen, there has been no time in history when an annual equity crediting method would not have generated a positive interest credit over a 5-year term.

83.     Perhaps the most glaring omission of the Security Benefit SOU is its

utter failure to disclose or describe the actual composition of the assets underlying the ALTV Index.  The SOU states only that the ALTV Index is based on the Trader Vic Index, which "measures the movements in prices of futures contracts on physical commodities, global currencies and U.S. interest rates that are publicly traded on a U.S. exchange that publishes the contracts' daily settlement prices." The SOU fails to disclose, however, that the futures contracts tracked by the Trader Vic Index are concentrated in commodities and currencies having an expected near-zero return and to the extent a minor portion of the indexed futures are tied to interest rates, any potential return exceeding the risk-free rate is offset by the spreads and charges exacted by the Royal Bank of Scotland and Security Benefit.

84.     In fact, the SOU not only fails to disclose the foregoing critical facts, it affirmatively misrepresents that the non-correlation of the ALTV Index to equity and bond markets is a positive feature without disclosing that attribute is a drag on future returns for the Total Value Annuities.  The SOU states that "[b]ecause the TVI is based on the 24 futures contracts on commodities, global currencies and U.S. interest rates, the daily values of the TVI are likely to be independent from the price movement of equity and bond indices." Such non-correlation in fact results in lower returns because, as alleged above, the non-correlated futures contracts are concentrated in asset classes producing expected returns no higher or little higher than the risk-free rate attainable through treasuries.

### 2.     The SOU for the MSDA Index

85.     The Security Benefit SOU for the MSDA Index is similarly misleading.  Like the description of the ALTV Index, the Security Benefit SOU description of the MSDA Index fails to disclose any information concerning the actual or anticipated allocation of the asset classes underlying the index.  The SOU states only that the MSDA Index "consists of U.S.-listed Exchange Traded Funds which track four distinct asset classes: (1) Equities, (2) Bonds, (3) Short-Term

Treasuries and (4) Alternatives. The allocation among the asset classes is determined by the rules-based strategy."

86.     The SOU fails to disclose that, over the past two decades, the MSDA Index on average has allocated *only about 15% or so* of the underlying asset classes to equities, with the balance allocated to short-term treasuries, bonds and commodities with expected returns no higher than the risk-free rate or, respectively, near zero. And once again, any meager expected future returns are then offset by spreads and other charges at the index or annuity level.

87.     In addition, just as with respect to the ALTV Index, the SOU falsely misstates the true nature and impact of the volatility control overlay, because the Secure Income Annuities have a 0% floor on the credited interest rate, while the volatility control reduces the positive impact of an increase in the value of the MSDA. The MSDA SOU misleadingly suggests that the volatility control overlay has a symmetrical impact on performance of the MSDA Index credits when it does not.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### A.     Plaintiff Rosen

88.     In November 2014, Security Benefit induced Plaintiff Rosen in California to purchase a Secure Income Annuity for $53,475.65, based on the represented advantages and illustrated performance of that Annuity compared to other annuities and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the MSDA Index.

89.     Security Benefit issued the Secure Income Annuity (No. xxxxxx6286) to Plaintiff Rosen on November 6, 2014.

90.     In reliance on the represented terms of the Secure Income Annuity contract, Plaintiff Rosen immediately allocated 75% of his account value ($40,

106.44) to the MSDA Index Account, which Security Benefit promoted as having no cap and 100% participation. The MSDA Index Account has a two-year Index Term.

91.   As confirmed by his 2016 Annual Statement, for the two-year period between November 6, 2014, and November 6, 2016, Security Benefit credited Plaintiff Rosen with interest in the MSDA Index Account at the rate of 0.00%.

92.   As confirmed by his 2018 Annual Statement, for the two-year period between November 6, 2016 and November 6, 2018, Security Benefit credited Plaintiff Rosen with interest in the MSDA Index Account at the rate of 1.68%.

93.   Plaintiff Rosen's overall credited interest in the MSDA Index Account was thus only $696.30 over the first four years of the Secure Income Annuity contract, an effective credited interest rate for MSDA Index Account of only 1.7%, consistent with the near-zero true expected performance of the MSDA Index for the reasons alleged above.

94.   In sum, the Secure Income Annuity has not only cost Plaintiff Rosen the lost use of more than $40,000 allocated to the MSDA Index Account, but also was worth less than he paid for it on the date of issuance, causing him to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

**B.    Plaintiff Stauffer-Schmidt**

95.   In April 2013, Security Benefit induced Plaintiff Stauffer-Schmidt in Illinois to purchase a Total Value Annuity for $248,657.84, based on the represented advantages and illustrated performance of that annuity compared to other annuities and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the ALTV Index.

96.   Security Benefit issued the Total Value Annuity (No. xxxxxx2358) to

Plaintiff Stauffer-Schmidt on April 15, 2013.

97.    In reliance on the represented terms of the Total Value Annuity contract, Plaintiff Stauffer-Schmidt immediately allocated 75% of her account value to the ALTV Index Account ($186,439.38), which Security Benefit promoted as having no cap and 100% participation. The ALTV Index Account has a five-year Index Term.

98.    As confirmed by her 2018 Annual Statement, for the five-year period between April 15, 2013, and April 15, 2018, Security Benefit credited Plaintiff Stauffer-Schmidt with interest in the ALTV Index Account at the rate of 0.00%, consistent with the true expected performance of the ALTV Index for the reasons alleged above.

99.    As confirmed by her 2019 Annual Statement, for the first year of her new five-year Index Term she has again experienced a zero percent return in the ALTV Index Account.

100.   In sum, the Total Value Annuity has not only cost Plaintiff Stauffer-Schmidt the lost use of more than $186,000, but also was worth less than she paid for it on the date of issuance, causing her to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions

C.    **Plaintiff Webber**

101.   In June 2014, Security Benefit induced Plaintiff Webber in Illinois to purchase two Total Value Annuities for $491,815.81 each, based on the represented advantages and illustrated performance of that annuity compared to other EIAs and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the ALTV Index.

102.   Security Benefit issued Total Value Annuity (No. xxxxx8728) to Plaintiff Webber on June 16, 2014, and Total Value Annuity (No. xxxxx8729) to Plaintiff Webber on June 17, 2014.

103. In reliance on the represented terms of the Total Value Annuity contract, Plaintiff Webber allocated to the ALTV Index Account 50% of his account value in No. xxxx8728 ($245,907.91), and 50% of his account value in No. xxxxx8729 ($245,907.91), which Security Benefit promoted as having no cap and 100% participation. The ALTV Index Account has a five-year Index Term.

104. As confirmed by his 2019 Annual Statements, for the five years between June 16/17, 2014 and June 16/17, 2019, Security Benefit credited Plaintiff Webber in the ALTV Index Accounts interest at the rate of 0.00%, consistent with the true expected performance of the ALTV Index for the reasons alleged above.

105. In sum, the Total Value Annuity has not only cost Plaintiff Webber the lost use of more than $500,000, but also was worth less than he paid for it on the date of issuance, causing him to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

**D.    Accrual of Plaintiffs' Claims under the Discovery Rule**

106. As alleged above, the operation of the Secure Income and Total Value Annuities and the Synthetic Indices are exceptionally complex instruments, which Security Benefit described in an opaque, incomplete and misleading manner, obfuscating the operative provisions through a maze of complicated and inter-related defined terms.

107. The true nature and operation of the Secure Income and Total Value Annuities and Synthetic Indices and the structure of the Annuities are so complicated that no reasonable person would have known of Security Benefit's wrongful conduct at the time of sale, let alone that such conduct had caused him or her injury at the point of sale.

108. Plaintiffs did not know, and were not until retaining undersigned counsel in any position to discover, the nature of Security Benefit's wrongful conduct nor the harm that it worked upon them.

### E.    Fraudulent Concealment and Equitable Tolling

109.    Alternatively, Security Benefit is by its own wrongful conduct – which was intended to and did obfuscate the deceptive nature and operation of the Synthetic Indices – precluded from asserting any limitations defense against Plaintiffs under the fraudulent concealment doctrine.

110.    Among other things, Security Benefit structured the Secure Income and Total Value Annuities using the ALTV and MSDA Indices to credit interest only at the end of the specified Index Term.  This structure operated to conceal from annuity owners that the Annuities would not perform as illustrated until the end of the applicable Index Term.  As observed on one industry forum, "if your client ever asks how they [ALTV Index] are doing, you will never really know a good answer until their 5th anniversary."[6]

111.    Security Benefit also intentionally restricted sale of the Secure Income and Total Value Annuities to a small group of tightly controlled independent marketing organizations, some of which were active participants in the fraudulent scheme alleged herein, to avoid disclosure of the fraudulent and misleading practices.

112.    In furtherance of its actions to fraudulently conceal its wrongful conduct, Security Benefit developed a subsequent series of interest crediting options that it launched as new alternative "improved" index options to deflect any suspicions when the ALTV and MSDA Indices failed to deliver the promised returns.

113.    To this day, Security Benefit continues to fraudulently conceal the wrongful conduct described herein from the class members and the general public. Security Benefit has refused to disclose or provide information about its practices

---

[6]    https://insurance-forums.com/community/threads/annuity-linked-tvi-index-by-security-benefit.47690/ (last visited on October 16, 2019).

in a way that Plaintiffs or the class members could have discovered. Although the initial decisions to perpetrate the fraudulent course of conduct alleged herein were made years ago, Security Benefit has continued its active concealment of those fraudulent practices.

114. Security Benefit's wrongful conduct is continuing in nature. There is a substantial nexus between the fraudulent conduct that has occurred within the applicable limitations periods and Security Benefit's misconduct prior to that time. The wrongful acts involve the same types of illicit practice and are part of a recurring, continuous series of events.

115. The statutes of limitations applicable to the claims alleged by Plaintiffs and on behalf of the class members as a result of the conduct alleged herein have been tolled as a result of Security Benefit's fraudulent concealment.

## CLASS ACTION ALLEGATIONS

116. This action is brought by Plaintiffs individually and on behalf of the following two plaintiff classes (collectively, the "Classes") pursuant to Rule 23(a) and (b)(2), *Federal Rules of Civil Procedure*.

**The California Class**:

All persons who owned a Secure Income or Total Value Annuity from Security Benefit that was issued within the applicable limitations period, who resided in California at the time the Annuity was issued, and who received an illustration on or before the date of annuity application.

**The Illinois Class:**

All persons who owned a Secure Income or Total Value Annuity from Security Benefit that was issued within the applicable limitations period, who resided in Illinois at the time the Annuity was issued, and who received an illustration on or before the date of annuity application.

### A.  Size of Classes

117.  There are thousands of members in the Classes described in the foregoing paragraph, and is thus so numerous that joinder of all members is impracticable. The identities and addresses of the members of the Classes can be readily ascertained from business records maintained by Security Benefit.

### B.  Adequacy of Representation

118.  Plaintiffs are willing and prepared to serve the Court and the proposed Classes in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interest that is adverse to, or which materially and irreconcilably conflicts with, the interests of the other members of the Classes.

119.  Plaintiffs have engaged the services of legal counsel indicated below who are experienced in complex class litigation and life insurance matters, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and the other members of the putative Classes.

### C.  The Commonality of Questions of the Law and Fact

120.  The claims of Plaintiffs and the members of the classes involve common questions of law and fact arising out of Security Benefit's alleged fraudulent scheme, including:

    a.  Whether Security Benefit has engaged in unlawful business practices in its dealings with Plaintiffs and the other members of the Classes;

    b.  Whether Security Benefit has engaged in unfair business practices in its dealings with Plaintiffs and the other members of the Classes;

    c.  Whether Security Benefit has engaged in fraudulent business practices in its dealings with Plaintiffs and other members of the Classes; and

    d.  Whether Plaintiffs and the other members of the Classes are entitled to equitable relief against Security Benefit, and if so in what form; and

e. Whether Plaintiffs and the other members of the Classes are entitled to compensatory or punitive damages, and if so in what amount.

**D.  Typicality of the Claims or Defenses of the Class Representatives**

121.  Plaintiffs' claims are typical of the claims and defenses of the other members of the Classes.

**E.  Rule 23(b)(2) Certification**

122.  Under Rule 23(b)(2), a plaintiff may maintain a class where the defendant has acted in a manner applicable to the entire class, making injunctive or declaratory relief appropriate.

123.  This action is appropriate as a class action pursuant to Rule 23 (b)(2) because Plaintiffs seek injunctive relief and corresponding declaratory relief for the benefit of the Classes. Security Benefit has acted in a manner generally applicable to each member of the Classes by utilizing the standardized contract forms and same standardized illustrations for all.

124.  Security Benefit's actions, if not enjoined, will subject Plaintiffs and other members of the Classes to continuing future harm and will cause irreparable injuries to them, denied as they are to access to their funds under the terms of the wrongfully induced Annuities. The adverse financial impact of Security Benefit's unlawful actions is continuing and, unless permanently enjoined will continue to irreparably injure Plaintiffs and the other members of the Classes.

**F.  Rule 23(b)(3) Certification**

125.  Rule 23(b)(3) allows for class actions when necessary to achieve economies of time, effort, and expenses, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

126.  The common issues of law and fact raised in this action readily predominate over any questions affecting only individual members of the Classes.

127. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a. Few, if any, members of the Classes could afford to seek legal redress individually for the wrongs that Security Benefit has committed against them, and absent members have no substantial interest in individually controlling the prosecution of individual actions;

b. Once Security Benefit's liability has been adjudicated with respect to the truthfulness of the uniform contract representations and illustrations as to Plaintiffs, the claims of all members of the Classes can be determined by the Court;

c. This action will ensure an orderly and expeditious administration of the Classes' claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

d. Without a class action, many members of the Classes would continue to suffer injury, and Security Benefit's violations of law will continue without redress while it continues to reap and retain the substantial proceeds and reductions in its future liabilities derived from its wrongful conduct; and

e. This action does not present any undue difficulties that would impede its management by the Court as a class action.

128. A class action is superior to other available means for the fair and efficient adjudication of this controversy. The injuries suffered by individual members of the Classes are, though important to them, relatively small compared to the burden and expense of individual prosecution needed to address Security Benefit's conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

### G.     Nature of Notice to the Proposed Class

129.   The names and addresses of all members of the Classes are contained in the business records maintained by Security Benefit and are readily available to Security Benefit. The members of the Classes are readily and objectively identifiable, and membership readily ascertainable. Plaintiffs contemplate that notice will be provided to members of the Class by e-mail and direct mailed notice.

## FIRST CAUSE OF ACTION
*(Injunctive and Restitutionary Relief Pursuant to the UCL – California Class)*

130. Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

131.   The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

132.   Security Benefit committed acts of unfair competition by engaging in the wrongful practices alleged above, which are alternatively actionable under all three prongs of the UCL.

- **Unlawful Prong**

133.   The "unlawful" prong of the UCL treats violations of other federal, state, regulatory, or court-made law as unlawful business practices independently actionable under state law.

134.    The standardized illustrations, marketing materials, and SOUs used to market the Secure Income and Total Value Annuities were unlawful and in violation of Cal. Ins. Code §§ 790.02 ("No person shall engage in this State in any trade practice which is defined in this article as, or determined pursuant to this article to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.") and 790.03(a) (defining as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance the "[m]aking,

37
CLASS ACTION COMPLAINT

issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular, or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby ….”), Cal. Ins. Code § 780 (“An insurer … shall not cause or permit to be issued, circulated or used, any statement that is known, or should have been known, to be a misrepresentation of the … terms of a policy issued by the insurer [or] … [t]he benefits or privileges promised thereunder….”), Cal. Ins. Code § 332 (“Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining.”), and § 331 (“Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance.”), and Cal. Civ. Code 1709 (“One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.”).

135. Specifically with respect to his citation to Cal. Ins. Code § 790.03(a), Plaintiff Rosen further alleges that the UCL violation occurred in the specific context of first-party false advertising and fraudulent inducement by Security Benefit, conduct that gives rise to independently actionable claims of common law fraud as well as violations of Cal. Ins. Code §§ 780 and 331-32, and Cal. Civ. Code § 1709. Security Benefit thus engaged in misconduct that allegedly violated § 790.03 in addition to obligations imposed by other statutes and the common law.

136. Plaintiff Rosen is informed and believes and, on that basis, alleges that the “unlawful” practices alleged above are continuing in nature and are widespread practices engaged in by Security Benefit.

- **Unfair Prong**

137. A claim under the UCL’s “unfair” prong is predicated on a business practice that violates established public policy or is immoral, unethical, oppressive

or unscrupulous and causes injury to consumers which outweighs its benefits.

138.   Security Benefit violated the "unfair" prong by engaging in the business acts or practices alleged above by which it has been unjustly enriched. Because the utility of Security Benefit's conduct (zero) is outweighed by the gravity of harm to Plaintiff Rosen and the other members of the California Class, and the market, Security Benefit's conduct is "unfair" having offended an established public policy.

139.   As alleged above, Security Benefit has engaged in immoral, unethical, oppressive, and unscrupulous activities that are reasonably avoidable and substantially injurious to the public at large. There were reasonably available alternatives to further Security Benefit's legitimate business interests other than the conduct described herein.

140.   Security Benefit furthermore violated UCL unfairness prongs based on its violations of Cal. Ins. Code §§ 790.02 & 790.03(a), Cal. Ins. Code § 780, Cal. Ins. Code §§ 331-32, and Cal. Civ. Code § 1709.

141.   Plaintiff Rosen is informed and believes and, on that basis, alleges that the "unfair" practices alleged above are continuing in nature and are widespread practices engaged in by Security Benefit.

- **Fraudulent Prong**

142.   Conduct is deceptive within the meaning of the UCL's fraudulent prong when members of the public are likely to be deceived by the practice.

143.   Security Benefit's materially misleading use and description of the Synthetic Indices in its standardized illustrations, marketing materials, and SOUs used to market the Secure Income and Total Value Annuities is likely to deceive members of the public, as confirmed by Bulletin 14-02 issued by the Iowa Insurance Division, *supra*, Paragraph 68. Plaintiff Rosen and other similarly situated persons in California have suffered economic injury as a result of the deception.

CLASS ACTION COMPLAINT

144. Reliance on Security Benefit's uniform misrepresentations and omissions concerning the description of the Synthetic Indices and the depicted performance of the Secure Income or Total Value Annuity in its illustrations, marketing materials, and SOUs is reasonably inferred because such information is something a reasonable man would attach importance to in determining his choice of action in the transaction in question.

145. Plaintiff Rosen is informed and believes and, on that basis, alleges that the "fraudulent" practices alleged above are continuing in nature and are widespread practices engaged in by Security Benefit.

- **UCL Standing**

146. Under the UCL, private standing is afforded to any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. To satisfy this standing requirement, a plaintiff must: (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim.

147. As alleged above, since the date of issuance the Secure Income Annuity has cost Plaintiff Rosen not only the lost use of tens of thousands of dollars allocated to the MSDA Index Account, but the Secure Income Annuity he purchased was itself worth less than he paid for it on the date of issuance, causing him to suffer economic injury in fact and loss of money or property as a result of Security Benefit's wrongful actions. Plaintiff Rosen thus has statutory standing to assert his UCL claim on behalf of himself and the putative Class.

- **UCL Relief Sought**

148. Cal. Bus. & Prof. Code § 17203 authorizes courts to make: "such

orders or judgments … as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person … any money or property … which may have been acquired by means of such unfair competition."

149. Cal. Bus. & Prof. Code § 17535 provides: "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."

150. Plaintiff Rosen accordingly seeks restitution, rescission, and injunctive relief for Security Benefit's UCL violations, the appropriateness of which will be determined by common evidence.

151. On behalf of the general public and the Class, Plaintiff Rosen respectfully request that this Court order that Security Benefit make available to the Plaintiff and other members of the California Class equitable relief in the form of either:

    a. rescission and restitution of all amounts wrongfully acquired, obtained and collected as the result of Security Benefit's alleged misconduct, but subject, as always in the case of equitable rescission, to offset for any benefits received in the interim; or

    b. court-ordered payment of the "intrinsic value" relief based on the estimated values of the Secure Income and Total Value Annuity

illustrations under different factual scenarios to calculate the impact on the illustrated values of the annuity features that Plaintiffs contend was misleadingly or fraudulently depicted in the illustration, plus

c.  prejudgment interest.

152.  Cal. Bus. & Prof. Code §17203 authorizes Plaintiff Rosen to pursue representative claims for injunctive relief.  On behalf of himself and the California Class, Plaintiff Rosen respectfully requests that the Court issue an injunction against Security Benefit permanently enjoining it from continuing to engage in its alleged unlawful, unfair and fraudulent conduct.

153.  Plaintiff Rosen finally respectfully requests an award of attorneys' fees as the prevailing party in his request for restitutionary and injunctive relief against Security Benefit on behalf of himself and the other members of the Class, under a "substantial benefit," "private attorney general," "catalyst," or "common fund" theory.

## SECOND CAUSE OF ACTION

### *(Violation of the ICFA – Illinois Class)*

154.  Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

155.  The ICFA is a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices.

156.  The ICFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, … in the conduct of any trade or commerce,"

regardless of whether any person has in fact been misled, deceived or damaged thereby. 815 ILCS 505/2.

157.   As alleged above, here Security Benefit made numerous statements concerning the nature, operation, and expected performance of the Synthetic Indices, and thus of the Annuities, in the illustrations, marketing materials and SOUs which were untrue statements of existing or future material fact, which Security Benefit knowingly made for the purposes of inducing the reliance of Plaintiffs Stauffer-Schmidt and Webber, on which Plaintiffs did rely and were damaged thereby.

158.   And as a result of Security Benefit's fraudulent misrepresentations and omissions, Plaintiffs Stauffer-Schmidt and Webber have at a minimum suffered actual damages in the form of the lost use of funds in their respective Account Values allocated to the ALTV Index.

159.   Alternatively, Security Benefit's conduct at a minimum supports an ICFA "unfairness" claim.

160.   A plaintiff may predicate an ICFA unfairness claim on violations of other statutes or regulations that themselves do not allow for private enforcement.

161.   Security Benefit's deceptive practices alleged above (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; or (3) cause substantial injury to consumers.

162.   In addition, Security Benefit's conduct "offends public policy" in that it violates both (a) the Illinois Insurance Code's prohibition against the misrepresentation of policy benefits under 215 ILCS 5/149, and (b) the prohibitions set forth in Illinois' enactment of the NAIC's Model Regulation on Advertisements of Life Insurance and Annuities, 50 Ill. Admin. Code Part 909.

163.   Security Benefit's breach of the foregoing Illinois Insurance Code and Illinois Administrative Code provisions thus constitutes actionable "unfairness"

under the ICFA.

164.   Section 10a(a) of the Illinois Insurance Code, 815 ILCS 505/10a(a), provides that "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." Section 10a (a) furthermore places the appropriate remedy, including injunctive relief, in the discretion of the trial judge. *Id.* ("The court, in its discretion may award actual economic damages or any other relief which the court deems proper;…"); 815 ILCS 505/10a(c) ("…in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party").

## THIRD CAUSE OF ACTION
*(Rescission and Restitutionary Relief Pursuant to Common Law Fraud – Both Classes)*

165.   Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

166.   Under California Civil Code Section 1709, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709. Because fraud is an intentional tort, a plaintiff must plead and prove the following elements of fraud: (1) misrepresentation; (2) knowledge of falsity; (3) intent [to] induce reliance; (4) justifiable reliance; and (5) resulting damage.

167.   Under Illinois common law, the elements of common law fraud are the same: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party as a result of the reliance.

168.   As alleged above, here Security Benefit in its standardized

illustrations, marketing materials, and SOUs used to market the Secure Income and Total Value Annuities has made false statements and omissions of material fact, known or believed by Security Benefit to be false, with the intent to induce Plaintiffs to purchase the Secure Income and Total Value Annuities in reliance on the truth of the statements, causing damages to Plaintiffs as a result of their reliance.

169.   Because the Synthetic Indices are used exclusively with the Annuities, prospective purchasers have no pre-existing or independent knowledge about them. Therefore, Plaintiffs in deciding to buy their Annuity and to allocate account values to those Indices necessarily relied on the representations made by Security Benefit concerning the performance of the Synthetic Indices in its sales illustrations, marketing materials and contract documents.

170.   As a result of Security Benefit's fraudulent misrepresentations and omissions, Plaintiffs Rosen, Stauffer-Schmidt and Webber not only collectively lost the use of hundreds of thousands of dollars in their Account Values for four to five years, but they also purchased Secure Income and Total Value Annuities worth less than what they paid for them on the date of issuance, causing them to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

171.   As the remedy for Security Benefit's fraudulent scheme, Plaintiffs seek an order giving them and each member of the Classes the option (a) to rescind his or her Secure Income or Total Value Annuity, entitling them to a refund of premiums paid, plus interest, subject to an offset for any interim benefits received, or (b) to rescind his or her allocation of the account value to the Synthetic Indices, and recover as restitutionary relief interest with respect to the amounts so allocated at the rate they would have received had allocated to funds to the Annuity's fixed account.

172.   Plaintiffs reiterate that they seek rescission and restitution based on

Security Benefit's uniformly misleading Annuity contract terms and illustrations, not based on the circumstances of any individual transaction.

173.   Plaintiffs in the alternative seek compensatory and punitive damages to the extent permitted under California law or Illinois law, respectively.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the respective Classes, pray for relief as follows as applicable for the particular cause of action alleged:

A.   An Order certifying this action to proceed on behalf of the Classes, and appointing Plaintiffs and the counsel listed below to represent the Classes;

B.   An Order awarding Plaintiffs and Class Members entitled to such relief restitution and/or rescissionary and such other equitable relief as the Court deems proper;

C.   An Order enjoining Security Benefit, its representatives, and all others acting with it or on its behalf from misrepresenting or concealing the expected performance of the Synthetic Indices over the terms required under the Secure Income and Total Value Annuities, and other appropriate injunctive relief as necessary to fully remedy Security Benefit's misconduct.

D.   An Order alternatively awarding Plaintiffs and Class Members entitled to such relief compensatory, punitive, and such other relief as the Court deems proper;

E.   An Order awarding Plaintiffs' attorneys' fees, expert witness fees and other costs pursuant to California and /or Illinois law, including under Code of Civil Procedure § 1021.5; and

1    F.    An Order awarding such other and further relief as may be just and

2  proper, including pre-judgment and post-judgment interest on the above amounts.

3

4                    **DEMAND FOR JURY TRIAL**

5        Plaintiffs demand a jury trial of all issues so triable.

6

7  Dated: October 16, 2019.

8                    **BONNETT FAIRBOURN FRIEDMAN**
9                    **& BALINT, PC**

10                    /s/ *Manfred P. Muecke*
11                    Manfred P. Muecke (SBN 222893)
                     600 West Broadway, #900
12                    San Diego, CA 92101
                     Tel: (619) 798-4292
13                    mmuecke@bffb.com

14
                     Andrew S. Friedman (*to be admitted Pro Hac Vice*)
15                    Francis J. Balint, Jr. (*to be admitted Pro Hac Vice*)
16                    2325 East Camelback Road, Suite 300
                     Phoenix, AZ 85016
17                    Tel: (602) 274-1100
18                    afriedman@bffb.com
                     fbalint@bffb.com
19

20                    **EVANS LAW FIRM, INC.**
21                    Ingrid M. Evans (SBN 179094)
                     3053 Fillmore Street #236
22                    San Francisco, CA 94123
                     Tel: (415) 441-8669
23                    Ingrid@evanslaw.com

24

25

26

27

28
                         47
                  CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FEM LAW GROUP**
F. Edie Mermelstein (SBN 248941)
401 Wilshire Boulevard, Twelfth Floor
Santa Monica, CA 90401
Tel: (213) 986-4300
edie@femlawyers.com

*Attorneys for Plaintiffs*

48
CLASS ACTION COMPLAINT